**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BARRY BELMONT,** *et al.* | : | |
| **Plaintiffs,** | : | **CIVIL ACTION** |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **MB INVESTMENT** | : | |
| **PARTNERS, INC.,** *et al.*, | : | **No. 09-4951** |
| **Defendants.** | : | |

<u>**MEMORANDUM**</u>

**Schiller, J.**                                                                              **June 10, 2010**

Defendant Mark Bloom controlled an investment vehicle through which he operated a Ponzi scheme that allowed him to live in the lap of luxury. After his deception was revealed, he pled guilty to charges of fraud and money laundering. Now, some of the people who invested money with Bloom are seeking to recover the money of which he defrauded them. Plaintiffs brought this action alleging violations of the federal securities law and various state law claims against Bloom, his employer, a portfolio manager who worked with Bloom, a number of officers and directors of Bloom's employer, and two entities involved with Bloom's employer. Presently before the Court are three motions to dismiss. For the reasons below, the Court will grant Defendant Ronald Altman's motion to dismiss. The remaining two motions to dismiss are denied.

## I.     FACTUAL BACKGROUND

### A.     The Defendants

MB Investment Partners, Inc. ("MB") is a registered investment advisor which entered into Investment Advisory Agreements with Plaintiffs. (Am. Compl. ¶ 8.) Centre MB Holdings, LLC

("CMB") is a private equity firm that owned 57% of MB's capital stock and controlled its operations through a contractual operating agreement. (*Id*. ¶ 9.) Center Partners Management, LLC ("CPM") owned the majority of CMB's capital stock and shared common directors with MB who served to insure that CPM and CMB were able to influence and control the operations and policies of MB. (*Id*. ¶ 10.) Robert Machinist was Chairman, Chief Operating Officer, and co-managing partner of MB, a member of its Board of Directors, and an owner of 14% of CMB's capital stock. (*Id*. ¶ 11.) Bloom was President, a co-managing partner, Chief Marketing Officer, and a director of MB. (*Id*. ¶ 12.) He was also the principal and sole member of North Hills Management, LLC and the general partner of North Hills, L.P. ("North Hills"). (*Id*.) Ronald Altman was a partner at MB, where he also served as senior managing director and portfolio manager. (*Id*. ¶ 13.) Lester Pollack was Chairman of CPM and a member of MB's Board of Directors. (*Id*. ¶ 14.) William Tomai, another member of MB's board, was Chief Administrative Officer and Chief Financial Officer of CPM. (*Id*. ¶ 15.) Guillaume Bébéar was a senior director of CPM and a member of MB's Board. (*Id*. ¶ 16.) P. Benjamin Grosscup, Thomas Barr, and Christine Munn were all partners, managing directors, and board members of MB. (*Id*. ¶¶ 17-19.) Robert Bernhard was a partner and a member of the MB Board of Directors. (*Id*. ¶ 20.) According to Plaintiffs, MB touted in press releases that Machinist and Bloom led its management team. (*Id*. ¶ 11.) In SEC filings, Pollack and Tomai were listed as being control persons of MB. (*Id*. ¶¶ 14, 15.)

### B.    Mark Bloom and North Hills

In 1997, Bloom formed North Hills as an enhanced stock index fund based on the S&P 500, S&P 400, and Russell indices. (Am. Compl. ¶ 32.) In exercising almost complete control of North Hills, Bloom disregarded any boundaries between him and North Hills. (*Id*. ¶¶ 33-34.) Bloom

embezzled North Hills' assets for his own personal use and even invested $17 million of its assets in the Philadelphia Alternative Asset Fund because he was a third-party marketer for the fund and received a lucrative commission from the fund. (*Id.* ¶ 35.) The investment in the Philadelphia Alternative Asset Fund, coupled with Bloom's lavish spending, left North Hills without any material assets when Plaintiffs invested in North Hills, despite the fact that the monthly account statements provided to North Hills investors had not shown a loss in over seven years. (*Id.* ¶ 36.) Bloom also lost millions of North Hills' funds in another fraud. (*Id.* ¶ 37.)

## C. Plaintiffs' Investments in North Hills

In June of 2006, Bloom met with Plaintiff Barry Belmont at the Westin Hotel in Philadelphia to discuss investments. Bloom handed Belmont his MB business card and extolled the conservative investment philosophy of MB; Belmont agreed that MB's conservative approach meshed with his investment preferences. (Am. Compl. ¶ 21.) At this meeting, Bloom discussed a variety of suitable investment vehicles for Belmont, including North Hills. (*Id.* ¶ 22.) According to Bloom, North Hills regularly returned 10-15% annually without significant risk by investing in hedge funds and other well-managed funds. (*Id.* ¶¶ 23-24.) A few weeks after this meeting, Belmont and John Wallace, the sole member of Plaintiff Philadelphia Financial Services, LLC ("PFS"), met with Bloom and Altman; Altman touted the virtues of MB's unique access to investment vehicles such as North Hills. (*Id.* ¶¶ 6, 26.) He also reiterated that North Hills was a conservative investment option without significant risk. (*Id.* ¶ 26.) Bloom and Altman prepared a proposed asset allocation dated July 12, 2006 that recommended Belmont put 20% of his investment in North Hills. (*Id.* ¶ 25.) Belmont invested $3.5 million in North Hills between July of 2006 and February of 2008. (*Id.* ¶ 63(a).)

Belmont tried to redeem his investment in North Hills but was told by Bloom that the North

Hills partnership agreement allowed redemptions only at the end of the year and only with ninety days notice. (*Id*. ¶ 72.) Bloom assured Belmont that his investment was safe and based upon Bloom's representations, Belmont withdrew his redemption request. (*Id*. ¶¶ 73-74.) Belmont subsequently renewed his request but has not been repaid on his North Hills investment. (*Id*. ¶ 75.)

In December of 2006, Plaintiff Thomas Kelly and Wallace met with Machinist and Bloom to discuss setting up an investment advisory relationship for Kelly with MB. (*Id*. ¶ 27.) Kelly and his wife, Plaintiff Frances Kelly, entered into an investment advisory agreement with MB, with which the Kellys invested $4.6 million. (*Id*. ¶ 28.) Altman was responsible for the oversight and management of the Kellys' investment portfolio. (*Id*.) During a meeting the Kellys had with MB, Bloom recommended that they invest in North Hills, which Bloom said was a fund that made diversified, conservative investments and enjoyed consistent positive returns. (*Id*. ¶ 29.) The Kellys invested $375,000 in North Hills. (*Id*. ¶ 63(c.).)

Thomas Kelly withdrew $25,000 from North Hills in December of 2008 and sought to regain more of his investment after Bloom was arrested. (*Id*. ¶ 76.) Bloom promised a response to Kelly's request but none has been forthcoming. (*Id*.)

Throughout 2008, Bloom solicited Wallace to invest PFS' funds in North Hills. (*Id*. ¶ 30.) Bloom described North Hills as a fund of funds that consistently generated positive returns with little risk. (*Id*.) PFS invested $450,000 with North Hills. (*Id*. ¶ 63(b).) PFS is, among other things, a vehicle through which Wallace channels his personal investments and from which Wallace draws funds for his personal needs. (*Id*. ¶ 6.) Wallace anticipated that any gains he realized through his investment would be available to him personally. (*Id*. ¶ 66.)

In the fall of 2008, Plaintiff Gary Perez called Bloom for investment advice; Bloom

recommended North Hills due to its consistently positive returns and conservative management. (*Id*. ¶ 31.) Perez invested $100,000 in North Hills. (*Id*. ¶ 63(d).)

### D. North Hills' Collapse

In January of 2008, two large investors wanted to redeem their investments but because North Hills did not have enough assets to honor the request, it made only small distributions to these investors in March of 2008. (*Id*. ¶ 40.) One of these large investors threatened legal action and, thereafter, Bloom's lawyer admitted to other investors that Bloom dipped into North Hills' funds to buy a luxury apartment in Manhattan and splurge on a spending spree that included beach houses, luxury cars and boats, and a 6,200 square foot triplex with a gym.[1] (*Id*. ¶¶ 41-43.) Bloom also used millions of dollars stolen from North Hills' investors to benefit people in MB, including buying a 14% interest in CMB, the majority shareholder of MB's corporate parent, and investing money in an enterprise in which Machinist and other MB executives were invested. (*Id*. ¶ 45.) Plaintiffs' money was also used to repay prior North Hills investors whose money had been lost because of Bloom's fraud. (*Id*. ¶ 46.)

On July 30, 2009, Bloom pled guilty to fraud and money laundering. (*Id*. ¶ 47.)

### E. Plaintiffs' Allegations

According to the Amended Complaint, the officers and directors of MB turned a blind eye to Bloom's illegal actions although they knew that he controlled North Hills and allowed him to sell interests in North Hills through MB. (*Id*. ¶¶ 52-53.) Plaintiffs allege that Defendants "failed to employ reasonable systems and controls that would have ensured that MB and its personnel placed

---

[1] Plaintiffs allege that after buying the triplex, he transferred his interest in it to his wife for $0. She then sold it for $11.2 million. (*Id*. ¶ 42.)

the interests of customers first, that there was a reasonable basis for its and their investment advice, that investments conformed to customer objectives, that clients were treated fairly and that full and fair disclosures were made to customers regarding conflicts of interest." (*Id*. ¶ 54.) MB's officers and directors never asked Bloom about his profligate spending and failed to monitor his activities despite the numerous red flags and intertwined operations of MB and North Hills. (*Id*. ¶¶ 55-58.) Altman, in his position of portfolio manager, was charged with overseeing and managing Plaintiff's investments yet failed to conduct any meaningful due diligence of the North Hills investment. (*Id*. ¶ 61.)

Plaintiffs claimed that they were duped and had no idea about Bloom's nefarious dealings. (*Id*. ¶ 63, 71.) Indeed, "[f]or every month for which plaintiffs remained investors in North Hills until 2009, their account statements showed a positive result. Based on these statements, plaintiffs believed their investments to be stable and secure." (*Id*. ¶ 70.)

Count One is a securities fraud claim against Bloom, Altman and MB under 15 U.S.C. § 78(j) and its related regulations. Count Two is a Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") claim against Bloom, Altman, and MB. Count Three is entitled "Controlling Person Liability" and is brought against CMB, CPM, Machinist, Pollack, Tomai, Bébéar, Grosscup, Munn, Barr, and Bernhard. This count alleges that as controlling persons as defined by the securities laws, these Defendants owed a duty to supervise MB, Bloom, and Altman but failed to uncover any fraud, rendering them liable under Section 20(a) of the Exchange Act. Count Four is a "Negligent Supervision By Officers and Directors" claim against Machinist, Pollack, Tomai, Grosscup, Munn, Barr, Bernhard, and Bébéar. Count Five (mislabeled Count Four) is a breach of fiduciary duty claim against Bloom, Altman, and MB.

Plaintiffs' original Complaint was filed on October 28, 2009.  Defendants filed motions to dimiss on February 1, 2010.  In Plaintiffs' response to these motions they requested that, if the Court was inclined to grant the motions, they be permitted to file an Amended Complaint.  Rather than rule on the motions to dismiss, the Court allowed Plaintiffs to file an Amended Complaint.  They did, and the motions to dismiss the Amended Complaint presently before the Court followed.

## II.    STANDARD OF REVIEW

In reviewing a motion to dismiss for failure to state a claim, a district court must accept as true all well-pleaded allegations and draw all reasonable inferences in favor of the non-moving party. *See Bd. of Trs. of Bricklayers and Allied Craftsman Local 6 of N.J. Welfare Fund v. Wettlin Assocs.*, 237 F.3d 270, 272 (3d Cir. 2001).  A court need not, however, credit "bald assertions" or "legal conclusions" when deciding a motion to dismiss.  *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

"Factual allegations [in a complaint] must be enough to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  To survive a motion to dismiss, a complaint must include "enough facts to state a claim to relief that is plausible on its face."  *Iqbal*, 129 S. Ct. at 1974.  Although the federal rules impose no probability requirement at the pleading stage, a plaintiff must present "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element[s]" of a cause of action.  *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S. Ct. at 1949.  Simply reciting the elements will not

suffice. *Id.* (concluding that pleading that offers labels and conclusions without further factual enhancement will not survive motion to dismiss); *see also Phillips*, 515 F.3d at 231.

The Third Circuit Court of Appeals has recently directed district courts to conduct a two-part analysis when faced with a 12(b)(6) motion. First, the legal elements and factual allegations of the claim should be separated, with the well-pleaded facts accepted as true but the legal conclusions disregarded. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). Second, the court must make a common sense determination of whether the facts alleged in the complaint are sufficient to show a plausible claim for relief. *Id.* at 211. If the court can only infer the mere possibility of misconduct, the complaint must be dismissed because it has alleged – but has failed to show – that the pleader is entitled to relief. *Id.*

A court faced with a motion to dismiss brought under the Private Securities Litigation Reform Act ("PSLRA") must look at the entire complaint, as well as documents incorporated into the complaint by reference and matters of which a court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## III.    DISCUSSION

### A.    Securities Fraud

The federal securities laws aim to protect investors from deceptive practices in the investing realm. *See* 15 U.S.C. § 78j (granting SEC power to establish rules to further statute forbidding manipulative or deceptive devices in connection with purchase or sale of securities). Rule 10(b)-5 makes it unlawful:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a claim under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). A plaintiff must specify each statement alleged to have been misleading as well as why the statement was misleading. *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 259 (3d Cir. 2009). Furthermore, a plaintiff must identify the "who" of the alleged misrepresentation or omission. *See Mill Bridge V, Inc. v. Benton*, Civ. A. No. 08-2806, 2009 WL 4639641, at *18 (E.D. Pa. Dec. 3, 2009).

The plaintiff must also allege facts that permit a strong inference of either reckless or conscious behavior. *Avaya*, 564 F.3d at 252, 267. "To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, a 'mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs*, 551 U.S. at 319 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 & n.12 (1976)).

Private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought by the Department of Justice and the Securities and Exchange Commission. *Tellabs*, 551 U.S. at 313. But, wielded improperly, such private actions can exact an incredible toll on undeserving companies and individuals. *Id.*

Accordingly, the Private Securities Litigation Reform Act of 1995 seeks to curb abusive private securities fraud actions. To further that objective, the law requires that in all such private securities lawsuits, the complaint "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief . . . shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Additionally, for those cases in which the plaintiff must show that the defendant acted with a particular state of mind, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id*. § 78u-4(b)(2). Failure to comply with either of these edicts "shall, on the motion of any defendant" lead to dismissal of the complaint. *Id*. § 78u-4(b)(3); *see also Avaya*, 564 F.3d 242, 252-53 (noting that PSLRA requires plaintiff to meet both pleading requirements found in § 78-u4(b)(1) and (b)(2) to survive motion to dismiss).

The PSLRA sets forth the appropriate standard to use in private securities actions, although Federal Rule of Civil Procedure 9(b)'s requirement that fraud be pled with particularity is nearly identical to § 78u-4(b)(1)'s demands. *Avaya*, 564 F.3d at 253. The scienter pleading requirement, however, found in the PSLRA is more stringent than the requirements of Rule 9(b). *Id*.

The threshold to survive a motion to dismiss under the PSLRA is high. For a complaint to properly create a "strong inference that the defendant acted" with scienter, the inference "must be more than merely plausible or reasonable-it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314; *Avaya*, 564 F.3d at 267. This standard requires courts to consider plausible opposing inferences to fraud. *Tellabs*, at 323-24.

### 1.    *Altman*

The allegations against Altman are that: (1) he and Bloom prepared a proposed asset allocation plan for Belmont that recommended placing 20% of Belmont's investment in North Hills; (2) Altman described MB and North Hills to Belmont and Wallace and informed them that MB had unique access to investment vehicles like North Hills; and (3) Belmont's February 29, 2008 investment in North Hills was the result of Altman's directive.  (Am. Compl. ¶¶ 25-26, 64.)  From that, Plaintiffs conclude that Altman engaged in a scheme with Bloom to bilk them of their money.

These allegations are insufficient to sustain a claim under the governing law.  The Amended Complaint lacks a factual allegation that would allow the Court to infer that Altman was involved in the fraud, furthered the fraud, benefitted from the fraud, or even knew about Bloom's fraud. Furthermore, the Amended Complaint makes clear that Bloom was the principal and sole member of North Hills Management, LLC and the General Partner of North Hills and that Bloom "exercised almost complete control over North Hills and its investments."  (Am. Compl. ¶¶ 12, 33.)

According to Plaintiffs, Altman was involved in a scheme with MB and Bloom in which they knowingly or recklessly engaged in practices that defrauded Plaintiffs.  (Am. Compl. ¶ 79.)  Altman "made various deceptive and untrue statements of material fact and omitted . . . material facts necessary in order to make the statements made . . . not misleading to the plaintiffs." (*Id*.)  Plaintiffs suggest that Altman had no business recommending the North Hills investment to them.  (*Id.* ¶ 65.) The reason that Plaintiffs lost money and the reason that North Hills was not an appropriate investment vehicle for them was that Bloom was stealing their money.  Parroting the language from the federal securities laws does not state a claim under those laws.  But Plaintiffs lack any allegations that Altman knew of Bloom's fraud.  Without any basis to find that Altman knew of Bloom's fraud

– and no basis to believe that discovery will uncover any evidence that Altman knew of the fraud – this Court concludes that Plaintiffs' securities claim against Altman is not plausible and fails to state a claim.

Fatal to Plaintiffs' claims against Altman is that the sparse allegations against him, taken as a whole, do not raise a strong inference of scienter. A "strong inference" of scienter can be established by alleging facts that provide strong circumstantial evidence of conscious misbehavior or recklessness. *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004). Reckless behavior involves not merely simple, or even inexcusable negligence, but requires an extreme departure from the standards of ordinary care, leading to a risk of misleading buyers or sellers that is either known to the defendant or is so obvious that the defendant must have been aware of the risk. *See Avaya*, 654 F.3d at 267 n.42 (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 535 (3d Cir. 1999)).

Plaintiffs allegations against Altman do not approach the scienter requirement the law demands. Altman did not control the North Hills investment and Plaintiffs' unsubstantiated suggestions that Altman was under a duty to monitor Bloom's movements cannot defeat a motion to dismiss. The Court cannot leap to the conclusion that because Bloom and Altman made investment recommendations and Bloom stole money from an investment vehicle that Bloom controlled, Altman acted with an intent to deceive, manipulate, or defraud. Indeed, given the absence of any allegations of criminal conduct on Altman's part coupled with the allegations that Bloom was steering the North Hills ship, an equally plausible inference to be drawn from the facts in the Amended Complaint is that Altman was unaware of the fraud and took no part in it. Reading the Amended Complaint as a whole, and taking all factual allegations as true, Plaintiffs seek to hold

Altman liable because his co-worker, Bloom, stole a lot of money and spent a lot of what he stole. Plaintiffs' statements that Altman "engaged in a common plan" and "knowingly or recklessly engaged in acts, practices and courses of business that operated as a fraud and deceit upon the plaintiff and made various deceptive and untrue statements of material fact . . ." do not satisfy the heightened pleading requirements of the PSLRA. *See Majer v. Sonex Research, Inc.*, 541 F. Supp. 2d 693, 705 (E.D. Pa. 2008) (holding allegations that defendants "knew" of fraudulent statements insufficient as scienter allegation). The Amended Complaint focuses almost entirely on Bloom's actions and purported statements about North Hills, a limited partnership over which Altman is not alleged to have control. But statements that Bloom made regarding the appropriateness of North Hills as an investment opportunity cannot be tied to Altman by virtue of the fact that the two men worked together. The Amended Complaint makes no allegations that Altman was aware of Bloom's squandering of North Hills' assets.

Plaintiffs' opposition to Altman's motion to dismiss contends that "Altman, in his capacity as a portfolio manager for MB, also touted both MB and the suitability of North Hills as an investment vehicle . . . ." (Pls.' Consolidated Mem. of Law in Opp'n to Defs.' Mots. to Dismiss the Am. Compl. [Pls.' Opp'n] at 15-16.) They rely on the asset allocation Altman and Bloom prepared and placed on MB letterhead that recommended a 20% investment in North Hills, and statements Altman made touting North Hills' performance and MB's unique access to North Hills. (*Id.* at 16.) The failure of one portfolio manager to discover the fraud of second manager perpetrated through a private fund he set up does not, on its own, establish a securities violation. Viewing the complete story pled by Plaintiffs, they have failed to show that it is at least as likely as not that Altman acted with scienter.

13

Plaintiffs also contend that Altman was reckless because he made statements about the success of North Hills as an investment vehicle without investigating the veracity of those statements. (*Id*. at 24-30.) Additionally, Plaintiffs say he ignored obvious signs of Bloom's fraud. (*Id*.)

"A reckless statement is one involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers and sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Advanta*, 180 F.3d at 535. Plaintiffs' allegations against Altman amount to a claim of negligence – that he should have discovered Bloom's fraud. But such allegations of negligence fall short of the definition of a reckless statement. *See id*. at 539 (explaining that a bare suggestion that a defendant must have had knowledge of facts is not sufficient to plead scienter). Plaintiffs try to point the finger at Altman by suggesting that his failure to conduct due diligence on the private fund controlled by Bloom was so egregious that had he done his homework, he easily would have discovered Bloom's fraud. Therefore, statements touting the success of North Hills were lies and Altman had no basis to believe them. But without tying Altman into the fraud or knowledge of the fraud, there is no basis for this Court to infer that Altman intended to deceive, manipulate, or defraud. It is also insufficient to allege that Altman had oversight responsibility over certain of Plaintiffs' investments. Plaintiffs' argument would render Altman an insurer of his client's money and open investment advisors to liability for failure to detect unsavory dealings in any of the companies they recommend.

"When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs*, 551 U.S. at

326. With respect to Altman, the answer is no. Because Plaintiffs have failed to plead facts sufficient to infer that Altman made any reckless statements or engaged in fraudulent behavior, the securities fraud claim against him is dismissed.[2]

      *2.    MB*

The parties dispute whether MB can be held liable for violations of the securities laws based on a *respondeat superior* theory of liability. The Third Circuit, in *Rochez Brothers, Inc. v. Rhoads*, 527 F.2d 880 (3d Cir. 1975) considered whether a corporation could be derivatively liable for the securities fraud of one of its employees. It concluded that "the principles of agency, i.e., *respondeat superior*, are inappropriate to impose secondary liability in a securities violation case." *Id*. at 884. Because "Congress did not intend anyone to be an insurer against the fraudulent activities of another," the Third Circuit determined that *respondeat superior* liability was contrary to Congress' intent behind the securities laws. *Id*. at 885. Nonetheless, the Third Circuit has determined that *respondeat superior* is a viable theory of recovery for cases under Rule 10b-5 based on "special duties that certain employers assume under the federal securities laws when their conduct is likely to exert strong influence on important investment decisions." *Sharp v. Coopers & Lybrand*, 649 F.2d 175, 181 (3d Cir. 1981), *overruled in part on other grounds by In re Data Access Sys. Sec. Litig.*, 843 F.2d 1537 (3d Cir. 1988) (en banc). Thus, secondary liability may be imposed in those cases that involve a "stringent duty to supervise employees," such as a broker-dealer relationship. *See id*. at 184; *Marion v. TDI, Inc.*, 591 F.3d 137, 151 (3d Cir. 2010); *Rochez*, 527 F.2d at 886.

---

[2] Because the Court finds that Plaintiffs failed to adequately plead scienter, the Court need not address Altman's contention that he did not make any actionable misrepresentations to Plaintiffs. The Court notes that the Amended Complaint is devoid of any allegations that he made any representations to Plaintiffs Perez or the Kellys, let alone a misrepresentation.

The Court is mindful of the directive that *respondeat superior* liability should not be widely expanded in the area of federal securities regulations. *See Sharp*, 649 F.2d at 183. Nonetheless, Plaintiffs' allegations – that MB failed in its duties to monitor one of its officers – are sufficient to state a securities fraud claim against Bloom and the relationship involved here between Bloom and MB prevents the Court from dismissing the 10b-5 claim against MB on a *respondeat superior* theory of liability at this stage in the proceedings.

### B.      Controlling Person Liability

Under Section 20(a) of the Securities Exchange Act of 1934,

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

To recover under Section 20(a), a plaintiff must show: (1) one person controlled another person or entity; (2) that the controlled person or entity committed a primary violation of the securities laws; and (3) that the defendant was a culpable participant in the fraud. *Fox Int'l Relations v. Fiserv Sec. Inc.*, 490 F. Supp. 2d 590, 601 (E.D. Pa. 2007) (citing *In re Suprema Specialties, Inc. Sec. Litig.* 438 F.3d 256, 284 (3d Cir. 2006)). If no controlled person is liable, no controlling person liability exists. *In re Alpharma Sec. Litig.*, 372 F.3d 137, 153 (3d Cir. 2004); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 279 (3d Cir. 1992).

Culpable participation is a prerequisite to a finding of liability under § 20(a). *See Rochez Bros.*, 527 F.2d at 884-85 ("The legislative history of Section 20(a) illustrates that Congress intended

liability to be based on something besides control. That something is culpable participation."); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d at 284 n.16 (noting that secondary liability under § 20(a) requires culpable participation in the fraud on the part of defendant). However, although it is clear that a plaintiff cannot recover under § 20(a) in this Circuit without showing culpable participation, it is not clear whether a plaintiff must plead facts demonstrating culpable participation to survive a motion to dismiss. Numerous courts in this Circuit have concluded that culpable participation need not be shown in the complaint. *See, e.g., In re Am. Bus. Finan. Servs., Inc. Sec. Litig.*, Civ. A. No. 05-232, 2007 WL 81937, at *11 (E.D. Pa. Jan. 9, 2007); *Freed v. Universal Health Servs.*, Civ. A. No. 04-1233, 2005 WL 1030195, at *11 n.6 (E.D. Pa. May 3, 2005) ("[T]he overwhelming trend in this circuit is that culpable participation does not have to be plead to survive a motion to dismiss."); *Derensis v. Cooper & Lybrand Chartered Accountants*, 930 F. Supp. 1003, 1013 (D.N.J. 1996). Other courts have decided that a plaintiff must allege not only a primary violation and control, but also culpable participation by the controlling defendant in the primary violation. *WM High Yield Fund v. O'Hanlon*, Civ. A. No. 04-3423, 2005 WL 1017811, at *9 (E.D. Pa. Apr. 29, 2005); *In re Ravisent Techs., Inc. Sec. Litig.*, Civ. A. No. 00-1014, 2004 WL 1563024, at *15 (E.D. Pa. July 13, 2004) ("To state a claim, the plaintiff must allege . . . that the controlling person was in some meaningful way a culpable participant in the primary violation."); *In re Equimed, Inc. Sec. Litig.*, Civ. A. No. 98-5374, 2000 WL 562909, at *10 (E.D. Pa. May 9, 2000) ('The heightened standards of the Reform Act apply to a § 20(a) claim, so a plaintiff must plead particularized facts of the controlling person's conscious misbehavior as a culpable participant in the fraud." (quoting *In re Cendant Corp. Sec. Litig.*, 76 F. Supp. 2d 539, 549 n.5 (D.N.J. 1999))).

    This Court is persuaded that a plaintiff need not allege facts demonstrating culpable

participation to survive a motion to dismiss a § 20(a) claim. The facts establishing culpable participation can only be expected to emerge after discovery and such facts are usually within the defendant's control. *See Am. Business Fin. Servs.*, 2007 WL 81937, at *11. Therefore, it would place an undue burden on a plaintiff to require factual allegations of culpable participation at such an early stage of the proceedings. As such, a plaintiff can survive a motion to dismiss a controlling person claim upon a showing of a primary violation of the federal securities laws by a controlled person and control of the primary violator by the defendant.

To the extent Plaintiffs assert § 20(a) liability on the basis of Defendants' control over Altman, that claim must fail because the Amended Complaint does not properly allege a primary violation of the securities laws by Altman. *See In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 211 (3d Cir. 2002) ("[I]t is well-settled that controlling person liability is premised on an independent violation of the federal securities laws."). However, Bloom has not moved to dismiss the claims against him and Plaintiffs have stated a claim that he and MB violated the securities laws. Thus, the question is whether Plaintiffs have stated a valid claim against the Defendants they deem to be in control of MB and/or Bloom.

Courts in this District have disagreed about whether the issue of control needs to be plead with specificity as dictated by the PSLRA. *Compare In re Am. Business Fin. Servs.*, 2007 WL 81937, at *12 ("Control person claims are not subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) or the Reform Act.") *with In re Equimed, Inc. Sec. Litig.*, 2000 WL 562909, at *10 ('The heightened standards of the Reform Act apply to a § 20(a) claim. . . ."). This Court need not resolve this dispute, however, because the facts as pled here survive under either standard. Plaintiffs have pled facts sufficient to survive a motion to dismiss because the pleadings

support a reasonable inference that Defendants had the potential to influence and direct the activities of the primary violator. *See O'Hanlon*, 2005 WL 1017811, at *10; *In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 524 (W.D. Pa. 2002). Plaintiffs' Amended Complaint alleges that CMB exercised day-to-day control over MB and that CMB, CMP, Machinist, Lester Pollack, Bruce Pollack, Tomai, Bébéar, Grosscup, Munn, Barr, and Bernhard had a duty to supervise MB, Bloom, and Altman. Specifically, Plaintiffs claim that: (1) CMB, Pollack, and Tomai exercised executive responsibility for the operations of MB and have been designated as control persons of MB in SEC filings; (2) Pollack, Tomai and Bébéar are senior executives of CMB and were designated as members of MB's board of directors to exercise policy influence over the affairs of MB; (3) Machinist led MB's management team that was responsible for MB's day-to-day operations; (4) Grosscup, Barr, Munn, Bernhard, and Bébéar exercised executive responsibility for MB's operations and had the power to direct the management and policies of MB. These factual allegations are sufficient to survive a motion to dismiss. *See O'Hanlon*, 2005 WL 1017811, at *10; *In re Ravisent Techs.*, 2004 WL 1563024, at *15.

## C. State Law Claims

### 1. Pennsylvania UTPCPL

The only party seeking to dismiss the UTPCPL claim against it is Altman.[3] The Pennsylvania UTPCPL states that, "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real

---

[3] In their original motion to dismiss, MB argued that Perez lacked standing to bring a UTPCPL claim and that PFS failed to plead that it invested money for services primarily for personal, family, or household purposes, as required by the statute. For some reason, MB's motion to dismiss the Amended Complaint does not raise these issues and therefore, the Court will not address them.

or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action to recover actual damages . . . ." 73 Pa. Cons. Stat. Ann. § 201-9.2(a). Plaintiffs allege that Defendants violated the catchall provision of the UTPCPL which declares unlawful "any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. Cons. Stat. Ann. § 201-2 (4)(xxi).

The pleading requirements under the UTPCPL for alleging deceptive conduct "are in flux." *Chiles v. Ameriquest Mortgage Co.*, 551 F. Supp. 2d 393, 398-99 (E.D. Pa. 2008). Courts have not uniformly determined whether a plaintiff alleging deception under the catchall provision must prove all of the elements of common law fraud. *Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 225 (3d Cir. 2008) (noting that some authority supports argument that not all common law fraud elements must be proven if plaintiff alleges deception under UTPCPL); *Commonwealth v. Percudani*, 825 A.2d 743, 746-47 (Pa. Commw. Ct. 2003) (citing cases concluding that common law fraud elements were not required to state a claim for deceptive practices). The UTPCPL, however, is to be liberally construed. *Keller v. Volkswagen of Am., Inc.*, 733 A.2d 642, 646 (Pa. Super. Ct. 1999).

For purposes of this motion, this Court will follow other courts in this District that have allowed UTPCPL claims to move forward without demonstrating all of the elements of common law fraud. *See Hansford v. Bank of Am.*, Civ. A. No. 07-4716, 2008 WL 4078460, at *13 (E.D. Pa. Aug. 22, 2008) (collecting cases in which pleading deceptive conduct was sufficient). Thus, Plaintiffs must show deceptive conduct and an ascertainable loss. *See id.* (citations omitted). Additionally, a plaintiff must show that he justifiably relied on a defendant's wrongful conduct or representations and that such reliance caused harm. *Hunt*, 538 F.3d at 224 ("[W]e conclude that private plaintiffs alleging deceptive conduct under the [UTPCPL] catchall provision must allege justifiable reliance.");

*Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 208 (Pa. 2007) ("[A] plaintiff alleging violations of the Consumer Protection Law must prove the common law fraud element of justifiable reliance."); *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 438 (Pa. 2004) ("To bring a private cause of action under the UTPCPL, a plaintiff must show that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance.").

Altman claims that Plaintiffs have not sufficiently alleged that he made any misrepresentations with the intent to mislead Plaintiffs, or that Plaintiffs justifiably relied on any representations he made. Based on the factual allegations contained in the Amended Complaint, Plaintiffs have failed to state a claim against Altman under the UTPCPL. As discussed in the portion of this memorandum related to claims of securities fraud against Altman, Plaintiffs' Amended Complaint does not sufficiently allege deceptive conduct on the part of Altman. The Amended Complaint states that Altman prepared a proposed asset allocation for Belmont that recommended that 20% of his investment be allocated to North Hills. (Am. Compl. ¶ 25.) It further states that Belmont and Wallace met with Bloom and Altman and during the meeting Altman touted North Hills' performance and practices and that MB had unique access to investment vehicles like North Hills. (*Id*. ¶ 26.) From these sparse allegations against Altman, Plaintiffs jump to the conclusion that Altman knowingly or recklessly made false representations as to the financial condition of North Hills, the use of the funds by North Hills, the performance of North Hills, and the investment philosophy, operations, and objectives of North Hills. (*Id*. ¶ 87(a)-(d).) Without any factual allegation that Altman was somehow involved with Bloom's fraud – as opposed to a conclusory allegation that Bloom's lavish lifestyle should have alerted him to Bloom's fraud – Plaintiffs cannot simply call Altman's actions deceptive and equate it with Bloom's stealing. While Plaintiffs have

phrased their allegations to state the elements of a UTPCPL claim, such a rote recitation of a statute's elements is insufficient to survive a motion to dismiss.

Plaintiffs also cannot make the requisite connection between any misrepresentation Altman made and a loss that they suffered. The loss was directly attributable to Bloom's lies, embezzlement and Ponzi scheme and not to anything Altman did or failed to do. The UTPCPL claim against Altman is dismissed.

### 2. *Negligent Supervision*

Pennsylvania law allows a claim against an employer for negligent supervision of an employee "where the employer fails to exercise ordinary care to prevent an intentional harm to a third-party which 1) is committed on the employer's premises by an employee acting outside the scope of his employment and 2) is reasonably foreseeable." *Mullen Topper's Salon & Health Spa, Inc.*, 99 F. Supp. 2d 553, 556 (E.D. Pa. 2000). A claim for negligent supervision provides a remedy for injuries to third parties who would otherwise be foreclosed from recovery under the principal-agent doctrine of *respondeat superior* because the wrongful acts of employees in these cases are likely to be outside the scope of employment or not in furtherance of the principal's business. *In re Am. Investors Life Ins. Co. Annuity Marketing & Sales Practices Litig.*, MDL No. 1712, 2007 WL 2541216, at *29 (E.D. Pa. Aug. 29, 2007) (citing *Heller v. Patwil Homes, Inc.,* 713 A.2d 105, 107 (Pa. Super. Ct.1998)); *see also IRPC, Inc. v. Hudson United Bancorp.,* Civ. A. No. 0474, 2002 WL 372945, at *4 (Phila. Ct. Com. Pl. Jan.18, 2002) (noting that employee must have acted outside scope of his employment to state a claim for negligent supervision).

The Court concludes that Plaintiffs' allegations that Defendants failed to control or monitor Bloom and thereby rendered his fraud foreseeable states a claim that they were negligent and

therefore the negligent supervision claim against Machinist, Pollack, Tomai, Grosscup, Munn, Barr, Barnhard, and Bébéar may proceed.

### 3. *Breach of Fiduciary Duty*

Altman has moved to dismiss the breach of fiduciary duty claim Plaintiffs have brought against him. He argues that the Amended Complaint fails to make any allegation of any contact or relationship between Altman and PFS, Thomas Kelly, Frances Kelly or Gary Perez, let alone a fiduciary one. (Mem. of Law in Supp. of Altman's Mot. to Dismiss Am. Compl. at 22.) He further charges that Plaintiffs fail to allege a direct fiduciary relationship existed, that the Amended Complaint failed to allege that he breached any purported duty, and that the Amended Complaint makes clear that any losses were caused by Bloom's illegal acts and not any breach committed by Altman. (*Id.*)

To allege a breach of fiduciary duty, a plaintiff must establish that: (1) a confidential or fiduciary relationship existed between the plaintiff and the defendant; (2) the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed; (3) the plaintiff suffered injury; and (4) the defendant's failure to act solely for the plaintiff's benefit was a real factor bringing about plaintiff's injuries. *Baker v. Family Credit Counseling Corp.*, 440 F. Supp. 2d 392, 414-15 (E.D. Pa. 2006).

Plaintiffs' breach of fiduciary duty claim against Altman rehashes their securities fraud claim against him. The Amended Complaint contains no allegation of any relationship between Altman and Plaintiff Perez or the Kellys, let alone a fiduciary one. As for PFS, the Amended Complaint mentions a single meeting between Wallace, Bloom, and Altman in June of 2006. But PFS did not invest until September of 2008 and its investment was with North Hills, which Plaintiffs admit

Bloom controlled. (Am. Compl. ¶¶ 26, 33, 63(b).)  There is thus no basis to infer a fiduciary relationship between Altman and PFS.  As for Belmont, though he invested shortly after meeting with Altman and Bloom, the allegations in the Amended Complaint do not create an inference that Altman was in a fiduciary relationship with Belmont.  Simply because Altman was an investment advisor at the same location where Bloom worked and Altman touted the virtues of an investment controlled by another portfolio manager does not create a fiduciary relationship.  The Court also dismisses as unfounded the allegation that Bloom orchestrated his scheme with the assistance and cooperation of Altman.  The suggestion that Altman breached any duty when he failed to correctly state the financial condition of North Hills or that Plaintiffs were caught in a Ponzi scheme rests on the already discredited notion that Altman, Bloom's co-worker, was required to discover Bloom's fraud. Finally, nothing Altman did brought about Plaintiffs' injuries.  Bloom's Ponzi scheme injured Plaintiffs.  Accordingly, the breach of fiduciary duty claim against Altman is dismissed.

IV.    **CONCLUSION**

Defendant Altman's motion to dismiss is granted and he is dismissed from this case.  The remaining motions to dismiss are denied.[4]  An Order consistent with this Memorandum will be docketed separately.

---

[4] Although Plaintiffs have advanced factual allegations sufficient to withstand a motion to dismiss against all Defendants except Altman, the Court will await summary judgment motions after the close of discovery.