**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BARRY BELMONT, et al.,** | : | |
| **Plaintiffs,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **MB INVESTMENT** | : | |
| **PARTNERS, INC., et al.,** | : | **No. 09-4951** |
| **Defendants.** | : | |

**<u>MEMORANDUM</u>**

**Schiller, J.**                                                                                    **January 5, 2012**

"Somebody once said that in looking for people to hire, you look for three qualities: integrity, intelligence, and energy. And if they don't have the first, the other two will kill you. You think about it; it's true. If you hire somebody without the first, you really want them to be dumb and lazy." This quote from Warren Buffett nicely sums up the above-captioned case. From all accounts, Mark Bloom was an intelligent, energetic money manager. Unfortunately, he was also a thief. While working for Defendant MB Investment Partners, Inc., he used his intelligence and energy to run a side project that turned out to be a Ponzi scheme. Plaintiffs in this case, Barry Belmont, Philadelphia Financial Services, Thomas Kelly, Jr., Frances Kelly, and Gary Perez, were victims of Bloom's fraud. They sued Defendants in an effort to recover some of the losses they suffered at the hands of Bloom. Presently before the Court are Defendants' motions for summary judgment. For the reasons that follow, the motions are granted.


I.      **BACKGROUND**

A.      **The Players**

Defendant Centre Partners Management, LLC ("CPM") is a Delaware limited liability

company that provides advisory and management services for various private equity investment funds, each of which is structured as a limited partnership and composed of outside investors. (Centre Defs.' Statement of Undisputed Facts in Supp. of Their Mot. for Summ. J. [Centre Defs.' Facts] ¶ 1; Pls.' Statement of Additional Facts in Opp'n to Defs.' Mots. for Summ. J. [Pls.' Additional Facts] ¶ 1.) These private equity investment funds own Centre Pacific Holding, LLC. (Centre Defs.' Facts ¶ 2.)

Defendant MB Investment Partners, Inc. ("MB"), where Bloom was working while he simultaneously operated a Ponzi scheme, was an investment advisor previously known as Munn Bernhard & Associates, Inc.[1] (Pls.' Additional Facts ¶ 10.) Defendants Robert Machinist and Bloom had an opportunity to purchase MB and approached CPM about teaming up after their purchase to buy other investment advisor firms; CPM, however, preferred to be involved with the purchase of MB from the beginning. (Centre Defs.' Facts ¶¶ 11, 14-15.)   On July 30, 2004, Bloom and Machinist, along with CPM, were among those who invested $14 million in Munn Bernhard & Associates, Inc. (MB Defs.' Statement of Undisputed Facts in Supp. of Their Mot. for Summ. J. [MB Defs.' Facts] ¶ 8; *see also* Pls.' Additional Facts ¶ 3; Centre Defs.' Facts ¶¶ 16-17.) Bloom and Machinist formed Defendant Centre MB Holdings ("CMB"), a limited liability company, to acquire an interest in non-party MB Investment Partners & Associates, LLC, which wholly owned MB. (Centre Defs.' Facts ¶¶ 6, 18; *see* Pls.' Additional Facts ¶ 5.) Thus, Centre Pacific Holding, LLC invested funds in MB through CMB. (Centre Defs.' Facts ¶ 3.) Centre Pacific Holding, LLC was the largest shareholder of CMB, followed by Machinist and Bloom. (*Id*. ¶ 7.)

Bloom signed an Executive Employment Agreement with Munn, Bernhard & Associates,

---

[1] The Court at times uses Munn Bernhard & Associates, Inc. and MB interchangeably.

Inc., effective July 30, 2004, which named him as a Managing Director, Vice President, Secretary, and Treasurer of MB. (MB Defs.' Facts ¶ 9; MB Defs.' Mot. for Summ. J. Ex. J [Bloom's Executive Employment Agreement].)

CMB designated Defendants Bloom, Machinist, Lester Pollack, William Tomai, and Guillaume Bébéar as directors of MB. (Centre Defs.' Facts ¶¶ 10, 23-24; Pls.' Additional Facts ¶ 13.) Pollack is also the founder and chairman of CPM, while Tomai is CPM's chief administrative and financial officer, and Bébéar is a senior director at CPM. (Centre Defs.' Facts ¶ 10.) Machinist was the CEO of MB, a position he retained until he was replaced by Michael Jamison in 2008, and a member of its board of directors. (Pls.' Additional Facts ¶¶ 13, 19.) Defendants Christine Munn, Thomas Barr, and P. Benjamin Grosscup also served as MB directors. (*Id*.) As part of the MB purchase, Defendant Robert Bernhard resigned as a director of MB and ceased to serve as an executive officer of MB.[2] (MB Defs.' Facts ¶¶ 11-12.)

All of the Plaintiffs invested money with Bloom's North Hills, L.P. Between 2006 and 2008, Bloom solicited Plaintiffs to invest approximately $4.4 million in the North Hills, L.P. (MB Defs.' Facts ¶ 7.) Plaintiffs Belmont and the Kellys also invested with MB and had an advisory agreement with MB. Plaintiffs Philadelphia Financial Services ("PFS") and Perez never entered into a written advisory agreement with MB. (MB Defs.' Facts ¶ 72.)

**B.    North Hills**

Bloom was a certified public accountant and senior tax partner at BDO Seidman from 1979 to 1992 and again from July 2001 to November 2003. (MB Defs.' Facts ¶ 1.) Bloom joined WG

---

[2] Plaintiffs contend that Bernhard was a partner and Senior Managing Director at MB and served on MB's executive committee as late as 2007. (Pls.' Resp. to MB Defs.' Facts ¶¶ 11-12.) This dispute is not material to the Court's legal analysis.

Trading Co., a hedge fund, in 1992, where he stayed until July 1, 2001. (*Id.* ¶ 2.) Upon leaving WG

Trading Co., Bloom assumed control of two entities affiliated with WG Trading Co.:  North Hills

Partnership, L.P. and North Hills Management, LLC. (*Id.* ¶ 5.)

       1.    *The Entity*

     North Hills, L.P. was formed in 1995 as a privately offered investment vehicle for a limited

number of accredited investors. (MB Defs.' Mot. for Summ. J. Ex. C [North Hills PPM].) The North

Hills, L.P. private placement memorandum describes North Hills, L.P. as a New York limited

partnership and as "a private investment partnership that acts as an investment management

intermediary, investing the Partnership's capital in carefully selected investment partnerships and

separately managed accounts." (*Id.*) The private placement memorandum states that North Hills

Management, LLC is North Hills, L.P.'s sole general partner. (*Id.*) The private placement

memorandum also states that Bloom is the sole principal of North Hills Management, LLC and that

the general partner "has sole authority over selection of investment managers for [North Hills, L.P.'s]

investments and the allocation and investment of [North Hills L.P.'s] assets." (*Id.*) The general

partner possessed full authority to make and execute all investment decisions on behalf of North

Hills, L.P. and to conduct the business of North Hills, L.P. (*Id.*) North Hills L.P.'s office was at "c/o

Mark Bloom, 502 Park Ave New York, New York 10022." North Hills Management, LLC, as

general partner, reserved "the right to reject any subscription in whole or in part" and was the only

entity "authorized in connection with this offering to give any information or to make any

representations other than as contained in this memorandum." (*Id.*) Bloom, as managing member of

North Hills, L.P., was "responsible for overall planning as well as supervising and selecting

investment managers." (*Id.*) Bloom maintained "full and complete authority with respect to the

management and control of the business operations and all other aspects of the Partnership." (*Id.*) "If for any reason [North Hills, L.P.] were to lose the services of Mark E. Bloom, the principal of the General Partner, the Partnership might have to be liquidated." (*Id.*)

Generally, an investor was required to post a minimum initial capital contribution of $250,000 into the fund and meet certain prerequisites to be deemed an "accredited investor" permitted to invest. (*Id.*) Nowhere in the private placement memorandum is MB, CMB, or CPM mentioned, nor are the names of the any of the individual Defendants other than Bloom referenced.

> 2.     *The North Hills Fraud*

Bloom was arrested on February 25, 2009. (MB Defs.' Facts ¶ 65.) The Information against Bloom charged him with securities fraud, mail fraud, wire fraud, money laundering, and obstruction of tax laws. According to the Information, Bloom was the sole owner of North Hills Management, LLC. (Centre Defs.' Mot. for Summ. J. Ex. 13 [Information] at 1.) North Hills Management, LLC, in turn, was the sole General Partner of North Hills, L.P. (*Id.*) From July 2001 through February 2009, Bloom defrauded North Hills, L.P.'s investors by "soliciting millions of dollars of funds under false pretenses, failing to invest investors' funds as promised, and misappropriating and converting investors' funds to [his] own benefit and the benefit of others without the knowledge or authorization of the investors." (*Id.* at 1-2.) Bloom told the investors that North Hills, L.P. would invest in different hedge funds and management investment vehicles, while minimizing risk and maximizing return. (*Id.* at 2.) Investors poured in millions of dollars to Bloom to invest, but instead he diverted at least $20 million from the North Hills, L.P. operating account, an amount much greater than he was entitled to in management fees and shares of profits. (*Id.* at 3.) He used the investors' money to renovate a house and apartments he owned, to buy art and jewelry, and to go on lavish vacations. (*Id.*

at 4.) Bloom also invested a significant sum of North Hills, L.P.'s investors' money with the Philadelphia Alternative Asset Fund, an entity with which Bloom had a referral agreement. (*Id*. at 4-5.) These investments were made without Bloom disclosing his conflict and in contravention of the diversification strategy Bloom laid out to investors of North Hills, L.P. (*Id*. at 5.) The assets of Philadelphia Alternative Asset Fund were frozen when it was discovered that the company and its president had engaged in fraud. (*Id*.) After Bloom was forced to disclose North Hills, L.P.'s investment in a fund that had its assets frozen, several North Hills, L.P. investors sought to redeem their investments. (*Id*.) Bloom could not honor these requests, however, because he had already diverted most of their money for his personal use. (*Id*. at 5-6.) Bloom lied to investors about the progress of litigation involving the Philadelphia Alternative Asset Fund. (*Id*.) In 2007 and 2008, Bloom solicited more money for a new class of shares in North Hills, L.P., but rather than invest the money as he had promised, he used this new influx of cash to honor prior redemption requests. (*Id*. at 6.) Bloom also regularly misrepresented the financial condition of North Hills Management, LLC, including by sending investors false monthly account statements. (*Id*. at 7, 9.)

On July 30, 2009, Bloom pled guilty to all of the charges in the Information. (Centre Defs.' Mot. for Summ. J. Ex. 14 [Guilty Plea].) In Bloom's own words, "I violated the securities laws by creating a scheme to defraud the investors in North Hills Fund and by sending communications to investors in North Hills that contained both false representations and material omissions with respect to the manner in which their money was being invested and as to the amount of money that was in their accounts." (*Id*.) He admitted to diverting money from investors to himself for his personal use and to operating a Ponzi scheme. (*Id*.)

On the same day he was arrested, Bloom was fired from MB. (MB Defs.' Facts ¶ 66.) MB

6

ceased operations on June 30, 2009. (*Id*. ¶ 68.) Following Bloom's arrest, the Securities and Exchange Commission investigated MB, but, to date, has taken no action against MB or any MB employee other than Bloom. (*Id*. ¶¶ 67, 69.)

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). When the movant does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

Thereafter, the nonmoving party demonstrates a genuine issue of material fact if it provides evidence sufficient to allow a reasonable finder of fact to find in its favor at trial. *Anderson*, 477 U.S. at 248. In reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms*, 32 F.3d 768, 777 (3d Cir. 2009). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## III.    DISCUSSION

### A.    Control Person Liability

Plaintiffs claim that Defendants CMB, CPM, Machinist, Pollack, Tomai, Bébéar, Grosscup,

Munn, Barr, and Bernhard (collectively, "the Centre Defendants") are liable under the federal securities laws for Bloom's actions. Specifically, Plaintiffs contend, the Centre Defendants violated Section 20(a) of the Exchange Act of 1934. The Centre Defendants argue that they are entitled to summary judgment on Plaintiffs' Section 20(a) claims for a number of reasons. First, CPM is not a proper defendant because it had no role in the day-to-day activities of Bloom or MB and thus cannot be termed a control person under 20(a). Second, neither the Centre Directors (Pollack, Tomai, Bébéar) nor CMB exercised or could exercise actual control over the daily operations of Bloom or MB. Third, the Plaintiffs cannot point to any evidence that demonstrates culpable participation by the Centre Defendants. Because the Court agrees with the Centre Defendants on this third point, the Court will grant the Centre Defendants summary judgment on the issue of control person liability under Section 20(a).

> According to Section 20(a) of the Securities Exchange Act of 1934,
>
> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Section 20(a) "imposes joint and several liability on the part of one who controls a violator of Section 10(b)." *In re Suprema Specialities, Inc. Sec. Litig.*, 438 F.3d 256, 284 (3d Cir. 2006). To succeed on a claim under 20(a), a plaintiff must show:  (1) one person controlled another person or entity; (2) that the controlled person or entity committed a primary violation of the securities laws; and (3) that the defendant was a culpable participant in the fraud. *Fox Int'l Relations v. Fiserv Sec. Inc.*, 490 F. Supp. 2d 590, 601 (E.D. Pa. 2007) (citing *In re Suprema Specialties, Inc.*

*Sec. Litig.*, 438 F.3d at 284). A controlling person is one who has, either directly or indirectly, "the power to direct or cause the  direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Rochez Bros. Inc. v. Rhoades*, 527 F.2d 880, 890 (3d Cir. 1975). To determine whether an individual is a controlling person, "plaintiffs must show that defendants exercised control over the accused operations, but need not show that defendants exercised control over the specifically accused transaction or activity." *In re Reliance Sec. Litig.*, 135 F. Supp. 2d 480, 518 (D. Del. 2001).

Culpable participation is a prerequisite to a finding of liability under § 20(a).  *See Rochez Bros.*, 527 F.2d at 884-85 ("The legislative history of Section 20(a) illustrates that Congress intended liability to be based on something besides control. That something is culpable participation."); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d at 284 n.16 (noting that secondary liability under § 20(a) requires culpable participation in the fraud on the part of defendant).

Culpable participation means that the defendant participated in the fraud or furthered the fraud through inaction. *In re Reliance Sec. Litig.*, 135 F. Supp. 2d at 518. Furthermore, the inaction must be deliberate and done intentionally to further the fraud. *Id.*; *see also The Lautenberg Found. v. Madoff*, Civ. A. No. 09-816, 2010 WL 4853354, at *3 (D.N.J. Nov. 19, 2010) ("The Third Circuit has held that inaction that *intentionally* furthers the fraud committed by the controlled person or entity or prevents its discovery establishes the controlling person's culpable participation in the fraud."). Knowledge of the facts underlying the fraud, "or even knowledge of the fraud itself, is simply not enough to establish culpable *participation* in the securities violation by an allegedly controlling person." *Steamfitters Local 449 Pension Fund v. Alter*, Civ. A. No. 09-4730, 2011 WL 4528385, at *11 (E.D. Pa. Sept. 30, 2011) (citing *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d

9

546, 563 (D. Del. 2002)); *see also VT Investors v. R & D Funding Corp.*, 733 F. Supp. 823, 841 (D.N.J. 1990) ("Here, plaintiffs allege only knowledge of wrongful conduct and fail to allege any knowing and substantial participation in the wrongdoing. Nor have plaintiffs alleged deliberate inaction, done intentionally to further the fraud."). Nor is mere inaction sufficient to show culpable participation. *Madoff*, 2011 WL 4853354, at *3.

Plaintiffs agree that "control person liability generally requires that the defendant be a 'culpable participant in the fraud.'" (Plaintiffs' Consol. Mem. in Opp'n to the Defs.' Mots. for Summ. J. [Pls.' Consol. Mem.] at 23.) Plaintiffs claim that the Defendants furthered Bloom's fraud through their recklessness by failing to introduce adequate controls that would have discovered Bloom's fraud and by failing to enforce the controls that they did maintain. (*Id*. at 24-27.)

Having reviewed the record in this case, the Court concludes that there is no genuine issue of material fact that would support a jury finding that the Centre Defendants were culpable participants in Bloom's fraud. Indeed, Plaintiffs' argument is circular: because the fraud was not detected, Defendants must have lacked the necessary controls and were therefore reckless; because they were reckless for failing to maintain adequate controls, the fraud was not detected. But this argument from hindsight fails to show that the Centre Defendants' inaction intentionally furthered Bloom's fraud.

Plaintiffs point to the failure of the Centre Defendants to create a "culture of compliance" necessary at MB to prevent frauds such as Bloom's from ripping off MB's investors. Plaintiffs cannot, however, escape the fact that they are relying on the inaction of the Centre Defendants to support their position. Whatever the contours of culpable participation, the Third Circuit has explicitly concluded that "[i]naction alone cannot be a basis for [§ 20(a)] liability." *Rochez Bros.*,

527 F.2d at 890. Rather, Plaintiffs must point to some evidence that would satisfy the Third Circuit's "requirement of knowing participation, particularly when . . . liability is premised largely on the alleged inaction and neglect of the defendants." *Laven v. Flanangan*, 695 F. Supp. 800, 809 (D.N.J. 1988). Plaintiffs cannot satisfy this standard based on their theory that the Centre Defendants should have—and easily would have— discovered Bloom's fraud, had they been more diligent.  And given the unique facts of this case, it makes little sense for the Centre Defendants to deliberately fail to act with the intent to further Bloom's fraud. Bloom's fraud while running North Hills, L.P. did not aid MB's investors. In fact, MB closed its doors shortly after Bloom was arrested. The only answer to the question of what the Centre Defendants did that intentionally furthered the fraud of Bloom is nothing. In the Third Circuit, that answer is fatal to a control person claim. Because the record contains no evidence of any participation in Bloom's fraud on the part of the Centre Defendants and instead relies on the theory that the Centre Defendants failed to discover the fraud and therefore failed to put an end to it, the Court grants summary judgment on Plaintiffs' Section 20(a) claims against the Centre Defendants.

### B.      Common Law Negligent Supervision

Plaintiffs bring a negligent supervision claim against Machinist, Pollack, Tomai, Grosscup, Munn, Barr, Bernhard and Bébéar (collectively, "the negligent supervision Defendants"), claiming that the negligent supervision Defendants failed to properly monitor Bloom, thereby causing injury to Plaintiffs. The negligent supervision Defendants contest this claim on numerous grounds, including by arguing that the tort requires an employer-employee relationship, which they did not have with Bloom, whose employer was MB. (Mem. of Law in Supp. of MB Defs.' Mot. for Summ. J. [MB Defs.' Mem.] at 21-22; Mem. of Law in Supp. of Centre Defs.' Mot. for Summ. J. [Centre

Defs.' Mem.] at 21-23.)

As an initial matter, Plaintiffs contend that the only question the negligent supervision Defendants can raise on summary judgment is whether Plaintiffs can "muster facts sufficient to create a genuine issue of material facts as to whether [the negligent supervision Defendants] failed to monitor and control Bloom." (Pls.' Consol. Mem. at 30.) This is because, according to Plaintiffs, the Court already decided as a matter of law that these Defendants could be held liable based on the allegations in the Complaint. (*Id*.) The Court did not previously decide whether the negligent supervision Defendants employed Bloom. The Court, faced with a motion to dismiss, concluded that the allegations against the negligent supervision Defendants stated a claim for common law negligent supervision. Plaintiffs, of course, may not rest on their allegations at this stage of the proceedings. Plaintiffs' victory on a 12(b)(6) motion is not a free pass to a jury.

To recover for negligent supervision under Pennsylvania law, a plaintiff must prove that his or her employer failed to exercise ordinary care to prevent an intentional harm to a third party that (1) is committed on the employer's premises by an employee acting outside the scope of his employment and (2) is reasonably foreseeable. *See Fox Int'l Relations*, 490 F. Supp. 2d at 614; *see also Blunt v. Boyd Gaming Grp.*, Civ. A. No. 08-285, 2008 WL 4694757, at *6 (E.D. Pa. Oct. 23, 2008) (noting that an employer may be liable if it knew or had reason to know of the unfitness or incompetence of its employee and could have reasonably foreseen that those qualities could harm others). "A claim for negligent supervision provides a remedy for injuries to third parties who would otherwise be foreclosed from recovery under the principal-agent doctrine of *respondeat superior* because the wrongful acts of employees in these cases are likely to be outside the scope of employment or not in furtherance of the principal's business." *In re Am. Investors Life Ins. Co.*

12

*Annuity Marketing & Sales Practices Litig.*, MDL No. 1712, 2007 WL 2541216, at *29 (E.D. Pa. Aug. 29, 2007) (citing *Heller v. Patwil Homes, Inc.*, 713 A.2d 105, 107 (Pa. Super. Ct.1998)); *see also IRPC, Inc. v. Hudson United Bancorp.*, Civ. A. No. 0474, 2002 WL 372945, at *4 (Phila. Ct. Com. Pl. Jan.18, 2002) (noting that employee must have acted outside  scope of his employment to state a claim for negligent supervision).

Defendants contend that Plaintiffs' negligent supervision claim fails because a negligent supervision claim can succeed against only an employer, which in this case is MB. The Court agrees that MB employed Bloom, and thus liability cannot attach to Machinist, Pollack, Tomai, Grosscup, Munn, Barr, Bernhard, or Bébéar. The cases applying this tort under Pennsylvania law repeatedly note that  liability is imposed upon an employer based on its failure to prevent a harm suffered by a third-party at the hands its employee. *See, e.g.*, *Petruska v. Gannon Univ.*, 462 F.3d 294, 309 n.14 (3d Cir. 2006) ("Under Pennsylvania law, an employer may be liable for negligent supervision . . ..") (citing *Mullen v. Topper's Salon & Health Spa, Inc.*, 99 F. Supp. 2d 553, 556 (E.D. Pa. 2000)); *Lerew v. AT & T, Inc.*, Civ. A. No. 07-1456, 2008 WL 80055, at *2 n.2 (M.D. Pa. Jan. 7, 2008); *Quandry Solutions, Inc. v. Verifone Inc.*, Civ. A. No. 07-97, 2007 WL 655606, at *5 (E.D. Pa. Mar. 1, 2007) (concluding that, without piercing the corporate veil, a parent cannot step into the shoes of its subsidiary and therefore be considered an employer); *Dempsey v. Walso Bureau, Inc.*, 246 A.2d 418, 422 (Pa. 1968) ("To fasten liability upon an employer [for negligent supervision], it must be shown that the employer knew, or in the exercise of ordinary care, should have known of the necessity for exercising control of his employee.").

Plaintiffs have lumped the negligent supervision Defendants together without any regard for their relationship to Bloom. The general statement that a board of directors and persons of senior

management have certain supervisory roles and duties over individuals who work for the same company as they do is not a basis to extend liability for the tort of negligent supervision. Plaintiffs also point to the "unique facts of this case" in which the "MB board of directors had more wide-ranging supervisory responsibility for the conduct of Mark Bloom than implementing the SEC-mandated compliance responsibilities." (Pls.' Consol. Mem. at 32.) But the Court sees nothing unique about Bloom reporting to the board of directors, who are ultimately charged with running the company. According to the Executive Employment Agreement that Bloom entered into, Munn Bernhard & Associates, Inc., which later became MB, "agree[d] to employ" Bloom. (Bloom's Executive Employment Agreement.) It does not follow that his employment with MB turned individual board members of MB into Bloom's employers as well.

Additionally, Plaintiffs' claim suffers from another flaw that warrants summary judgment: there is no evidence that Bloom's fraud was reasonably foreseeable. To succeed on this claim, there must be evidence that the individuals charged with negligent supervision knew or should have known that Bloom would operate North Hills, L.P. as a Ponzi scheme. *See Reneau v. Shoney's Inc.*, Civ. A. No. 98-5225, 1999 WL 554587, at *5 (E.D. Pa. June 16, 1999) (noting that to sustain a negligent retention claim, "the employer must either know or have reason to know of the employee's past incompetency or carelessness"); *accord Gorwara v. AEL Indus., Inc.*, Civ. A. No. 89-6401, 1990 WL 44702, at *5 (E.D. Pa. Apr. 12, 1990); *Dempsey v. Walso Bureau, Inc.*, 246 A.2d at 422-23. Thus, it is necessary to ask whether Bloom's conduct prior to his fraud would have led the negligent supervision Defendants to suspect he would commit fraud and whether those Defendants knew or should have known of Bloom's propensity to commit fraud. *See Blunt*, 2008 WL 4694757, at *6.

14

Plaintiffs' theory that Bloom's fraud should have been uncovered does not address this question. Plaintiffs have failed to submit any evidence that any Defendant had reason to know at the time he was hired that Bloom was defrauding North Hills, L.P.'s investors. Rather, Plaintiffs have speculated that if Defendants had asked about or investigated North Hills, L.P., they would have discovered Bloom's actions. But despite repeated references to "red flags," Plaintiffs rely on speculative hindsight. That does not create a triable issue of fact, and the Court therefore grants summary judgment on Plaintiffs' negligent supervision claim.

### C.    Securities Violation Claim

Plaintiffs charge that MB is guilty of violating the federal securities laws, both primarily and under the doctrine of respondeat superior. Specifically, they claim that Bloom's fraud, coupled with his position are sufficient to demonstrate that MB is primarily liable here. Additionally, they argue that statements made by Bloom and MB employee Ronald Altman should be imputed to MB. The Court rejects both of these arguments.

Rule 10b-5 makes it unlawful:

(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

The elements of a securities claim under § 10(b) and Rule 10b-5 are: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

15

misrepresentation or omission; (5) economic loss; and (6) loss causation. *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011).

The problem with Plaintiffs' 10b-5 claims—and many of their other claims—is that they are based on fraudulent conduct involving North Hills, L.P., an entity unrelated to MB. Plaintiffs do not charge that any individuals made false statements about MB or its investments. The fraud here involved an MB employee who, acting as the sole principal and owner of a general partner of another entity, stole money from investors. Thus, any connection between misrepresentations made to Plaintiffs would have been with respect to investments made in North Hills, L.P., not MB. Plaintiffs note that the Third Circuit has stated that because high ranking officers in a corporation can make policy and generally are able to bind the corporation, "their action in behalf of the corporation is therefore primary, and holding a corporation liable for their actions does not require respondeat superior." (Pls.' Consol. Mem. at 11 (quoting *Sharp v. Coopers & Lybrand*, 649 F.2d 175, 183 n.8 (3d Cir. 1981)). Were this case about Bloom acting on behalf of MB, MB could not escape liability for Bloom's conduct. But this case presents a different set of circumstances, however, in which Bloom's fraud was accomplished through a partnership that existed before he began working for MB and the victims of his fraud were all investors of the partnership, not necessarily of MB. Indeed, Plaintiffs Perez and PFS were not even investors of MB, but only in North Hills, L.P. Plaintiffs have cited no decision extending liability under the federal securities laws to a corporation that had no involvement with the plaintiff harmed. Plaintiffs wish to extend MB's liability for Bloom's actions to any activity involving investments solely based on Bloom's role at MB and without regard to whether he was acting in MB's interests or causing harm to MB. Accordingly, this Court must heed the warning from the Third Circuit: "[w]e . . . emphasize strongly that the doctrine of respondeat

superior, though applicable in [the *Sharp* case], has not been and should not be widely expanded in the area of federal securities regulation." *Id*. at 182-83. Thus, the Court grants summary judgment in favor of MB on Plaintiffs' securities violations charge.

**D.    Fiduciary Duty**

To recover for a breach of fiduciary duty under Pennsylvania law, a plaintiff must prove: (1) the existence of a fiduciary relationship; (2) that the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed; (3) that the plaintiff was injured; and (4) that the defendant's failure to act solely for the benefit of the plaintiff was a real factor in causing the plaintiff's injury. *Airgas, Inc. v. Cravath, Swaine & Moore, LLP*, Civ. A. No. 10-612, 2010 WL 3046586, at *4 (E.D. Pa. Aug. 3, 2010).

MB argues that Plaintiffs Perez and PFS never had a fiduciary relationship with MB because neither party invested with MB, paid MB fees, or entered into an agreement with MB. (MB Defs.' Mem. at 15-16.) Perez and PFS argue  that based upon the representations of MB employees, PFS and Perez believed that MB was their investment adviser and that they therefore maintained a fiduciary relationship with MB. (Pls.' Consolidated Mem. at 38-40.)

Under Pennsylvania law, a fiduciary relationship does not rest on a specific association between the parties. *See Vicki M. v. Ne. Educ. Intermediate Unit,* 689 F. Supp. 2d 721, 739 (M.D. Pa. 2009) (citing *Leedom v. Palmer*, 117 A. 410, 411 (Pa. 1922)); *Perry v. Drivehere.com, Inc.*, Civ. A. No. 11-2429, 2011 WL 3204818, at *7 (E.D. Pa. July 28, 2011). Rather, a fiduciary relationship exists upon a showing that the parties have "reposed a special confidence in each another to the extent that the parties do not deal with each other on equal terms." *Brandow Chrysler Jeep Co. v. Datascan Techs.*, 511 F. Supp. 2d 529, 538-39 (E.D. Pa. 2007) (quoting *In re Clark's Estate*, 359

17

A.2d 777, 781 (Pa. 1976)). "The special confidence required of the parties can be satisfied by 'an overmastering dominance on one side, or weakness, dependence or justifiable trust, on the other.'" *Id*. at 539 (quoting *Clark's Estate*, 359 A.2d at 781). Pennsylvania law is clear that a fiduciary relationship does not exist merely because one party relies on the superior skill of another. *See eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 22-23 (Pa. Super. Ct.2002). "[T]he critical question is whether the relationship goes **beyond** mere reliance on superior skill, and into a relationship characterized by 'overmastering influence' on one side or 'weakness, dependence, or trust, justifiably reposed' on the other side." *eToll,* 811 A.2d at 23 (quoting *Basile v. H & R Block, Inc.*, 777 A.2d 95, 101 (Pa. Super. Ct. 2001)) (emphasis in original). "A confidential relationship is marked by such a disparity in position that the inferior party places complete trust in the superior party's advice and seeks no other counsel, so as to give rise to a potential abuse of power." *Id*. (citing *Basile*, 777 A.2d at 102).

Plaintiffs' claim that MB had a fiduciary relationship with Perez and PFS does not find support in the record. Plaintiffs do not dispute that Perez and PFS invested only with North Hills, L.P., but suggest that Bloom's position with MB led them to believe that MB was their investment advisor. Perez, however, testified in his deposition that Bloom did not talk with him about investing money in MB; Perez also failed to pinpoint any statements or documents indicating that he entered into a business relationship with MB. Instead, according to Perez, Bloom was "the common denominator." (App. of Exs. in Supp. of Pls.' Opp'n to Defs.' Mots. for Summ. J. Ex. 9 [Perez Dep.] at 86.) Perez further testified that he believed Bloom would manage the money that Perez invested in North Hills, L.P. (*Id*. at 95-96.) Perez also said that he was motivated to invest with Bloom and North Hills, L.P. because "[Bloom] bought MB Advisors and he was just doing very well." (*Id*. at

18

126.) Nowhere is there evidence that Perez thought he was entering into any relationship with MB, let alone a fiduciary relationship. All that Perez could say was that Bloom implied that North Hills, L.P. was affiliated with MB "by talking about both entities at the same time and that he was president of both and he controlled North Hills." (*Id*. at 129; *see also id*. at 154.) Aside from his interactions with Bloom and a ten-minute conversation with Machinist during which they did not discuss investing with MB or North Hills, L.P., the record lacks evidence that Perez had any relationship with MB. Tellingly, after Perez learned that something was amiss with his North Hills, L.P. investment, he made no attempt to call anybody at MB. (*Id*. at 148; *see also id*. at 162-63.)

Similarly, the deposition of John Wallace, the sole owner, officer, and director of Plaintiff PFS, makes clear that PFS's investment relationship was with North Hills, L.P. PFS had no written agreement with MB and received no written materials from MB about its investment with North Hills, L.P.

MB concedes that it owed a fiduciary duty to the Kellys and Belmont. Nonetheless, MB argues that it cannot be liable for breaching its fiduciary duty because Plaintiffs cannot show that MB acted in bad faith towards them, and Plaintiffs cannot show that MB's failure to act in their best interests was a real factor in causing Plaintiffs' injury. The Court agrees.

The consistent theme throughout Plaintiffs' papers is that if Defendants simply had done more or had asked more questions, this fraud would have become evident years earlier. The conjecture is not borne out by the record, however. The Court finds no evidence that suggests that MB should have known that Bloom was operating North Hills, L.P. to steal money from those who invested with North Hills. Thus, it cannot be said that MB violated its duty to Plaintiffs or that MB's actions caused Plaintiffs' losses, which were caused by Bloom acting as the sole principal for North

Hills Management, LLC.

### E.    Pennsylvania Unfair Trade Practice and Consumer Protection Law Claim

Plaintiffs' Pennsylvania Unfair Trade Practice and Consumer Protection Law ("UTPCPL") claim against MB is brought under the law's catch-all provision, which prohibits "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 Pa. Cons. Stat. § 201-2(4)(xxi). A plaintiff bringing a claim under the UTPCPL must show that he or she justifiably relied on the defendant's wrongful conduct or representations and that he or she suffered harm as a result. *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 438 (Pa. 2004).

Plaintiffs argue that the conduct of Bloom and Altman should be imputed to MB. Under Pennsylvania law, "the imputation doctrine recognizes that principals generally are responsible for the acts of agents committed within the scope of their authority." *Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PriceWaterhouseCoopers, LLP*, 989 A.2d 313, 333 (Pa. 2010). As Plaintiffs note, imputation also protects those who transact business with a corporation through its agents with the understanding that the agent is acting with the principal's authority. *Id.* However, the "adverse interest" exception to the general rule of imputation provides that "a third party would not be able to impute an agent's bad acts to the principal corporation if those bad acts were only in the agent's self-interest and conferred benefits only to the agent, not the corporation." *Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PriceWaterhouseCoopers*, 607 F.3d 346, 352 (3d Cir. 2010); *see also McNamara v. PFS*, 334 F.3d 239, 243 (3d Cir. 2003) ("Under what is known as the 'adverse interest exception,' fraudulent conduct will not be imputed if the officer's interests were adverse to the corporation and not for the benefit of the corporation.").

20

Given the record in this case, the Court concludes that the adverse interest exception applies here, and the fraud perpetrated cannot be imputed to MB. Bloom used his position as the sole principal of North Hills, L.P. to steal money from North Hills, L.P.'s clients, who, in the case of Belmont and the Kellys, happened to be clients of MB as well, so that Bloom could live an opulent lifestyle. The Court does not see how a jury could determine that such actions benefitted MB. Indeed, in February of 2009, Belmont transferred $1 million from his MB account to North Hills, L.P. (App. of Exs. in Supp. of Pls.' Opp'n to Defs.' Mots. for Summ. J. Ex. 2 [Belmont Dep.] at 187; *id*. Ex. 105 [Wire Instructions]; *id*. Ex. 136 [Mar. 3, 2008 North Hills, L.P. letter].) Thus, Bloom took money from investors in North Hills, L.P., money that could have been invested with MB, and used it to finance his lavish lifestyle. As for Perez and PFS, they invested no money with MB. *See Siemens Bldg. Techs., Inc. v. PNC Fin. Servs. Group, Inc.*, 226 F. App'x 192, 200-01 (3d Cir. 2007) (Ambro, J., concurring) (noting that some states are "reluctant to hold a master liable for a servant's fraud when the servant is acting against the master's interests") (citing *Todd v. Skelly*, 120 A.2d 906, 909-10 (Pa. 1956)); *Lilly v. Hamilton Bank of N.Y.*, 178 F. 53, 56 (3d Cir. 1909) ("[W]here one in transacting the business of his principal is committing a fraud for his own benefit he is not acting within the scope of his authority as his principal's agent, and therefore that his knowledge of the fraud is not imputable to his principal.") The record is devoid of evidence that MB had any notion that Bloom used North Hills, L.P. as his piggy bank; furthermore, Bloom's actions served only to harm MB, which ceased business operations approximately four months after Bloom was arrested.

As Bloom's fraud in this case cannot be imputed to MB, Plaintiffs cannot survive summary judgment on their UTPCPL claim. Similarly, Bloom's fraud will not be imputed to MB with respect to Plaintiffs' securities violation claim.

21

**IV.     CONCLUSION**

Despite the plethora of paperwork filed in this case, it is not difficult to discern what occurred. MB hired a man who concocted and carried out a scheme to bilk investors out of lots of money so that this man could live very well. Some of the bilked investors are rightfully angered by this man, but he has no money. So, seeking to recoup some of their losses, they are suing individuals and entities that do have money. But these entities and individuals were also harmed by the same man. Thus, Plaintiffs' claims are against Bloom and Bloom alone. Defendants' motions for summary judgment are granted. An Order consistent with this Memorandum will be docketed separately.